COMMUNITY BUILDERS, INC., an Arizona Corporation, Plaintiff-Appellant,

v.

The CITY OF PHOENIX, a municipal corporation, and the City of Scottsdale, a municipal corporation, Defendants-Appellees.

No. 79–3354.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 9, 1981.

Decided Aug. 3, 1981.

Rehearing Denied September 2, 1981.

* Honorable William P. Copple, United States District Judge for the District of Arizona, sitting by designation.

Daryl M. Williams, Phoenix, Ariz., for plaintiff-appellant.

Carol Benyi, Phoenix, Ariz., argued for defendants-appellees; Clifford Sherr, Scottsdale, Ariz., Bill Stephens, Phoenix, Ariz., on brief.

Before ANDERSON and NORRIS, Circuit Judges, and SCHWARZER,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

Community Builders, Inc. appeals from a judgment below granting the motions of the defendant Cities for summary judgment and denying Community Builders' cross-motion for summary judgment. The district court dismissed with prejudice Community Builders' complaint seeking relief under the Sherman Act, 15 U.S.C. § 1 *et seq.*, against the Cities for a number of alleged antitrust violations arising from the provision of municipal water services. We affirm.

## I. BACKGROUND

Community Builders is the successor in interest to David R. Johns, Inc., an Arizona corporation. Sometime during the 1970's, Johns became interested in developing a tract of land located within the City of Scottsdale as an apartment complex. After securing financing for the project in a manner to be described in greater detail *infra*, Johns sought to make arrangements for the provision of water service to the complex. Scottsdale charged a water hookup fee of $400 per apartment unit, for a total fee of $137,600 for the entire 344-unit project. Scottsdale required payment of the total hookup fee as a condition precedent to the issuance of a building permit.

Upon further investigation, the president of Johns discovered that the parcel had at one time been serviced by the City of Phoenix. Phoenix did not charge a water hookup fee for its municipal water service. Phoenix had serviced the property from 1949 until the early Seventies by virtue of its acquisition of a private water company which had been providing water to a residential structure located on the Johns property. Scottsdale, however, refused Johns' request to allow Phoenix to service the property, and Phoenix eventually rescinded an earlier commitment to provide service.

Scottsdale claimed the exclusive right to service the Johns project on the basis of the so-called "Glass Door Agreement," which was reached in 1972 between city officials from Phoenix and Scottsdale. The Glass Door Agreement divided up water service areas between the Cities' two municipal water companies in border areas where conflict was likely. Even though each of the Cities was apparently willing to provide water service to customers located outside of its corporate boundaries, neither was insistent on providing such service to customers located within the limits of the other. In the case of the Johns project property, Phoenix officials apparently acquiesced in what they perceived as Scottsdale's superior right to service areas located within its city limits, despite Phoenix' prior history of servicing the property.

Arizona law expressly forbids competition between municipal utilities and other providers of public utility service. Under A.R.S. § 9–516,[1] known as the "Tin Pipe

---

* The Honorable William W. Schwarzer, United States District Judge, Northern District of California, sitting by designation.

1. In its entirety, A.R.S. § 9–516 reads as follows:

   "§ 9–516. *Declaration of public policy; eminent domain*

   "A. It is declared as the public policy of the state that when adequate public utility service under authority of law is being rendered in an area, within or without the boundaries of a city or town, a competing service and installation shall not be authorized, instituted, made or

carried on by a city or town unless or until that portion of the plant, system and business of the utility used and useful in rendering such service in the area in which the city or town seeks to serve, has been acquired.

   "B. The city or town which seeks to acquire the facilities of a public service corporation shall have the right to do so under eminent domain. Such action shall be brought and prosecuted in the same manner as other civil actions.

   "C. A city or town acquiring the facilities of a public service corporation rendering utility service without the boundaries of such city or

Law," a municipality may not compete with a public service corporation which is providing utility service unless the municipality acquires the "used and useful" portion of the existing utility's system. The Arizona Supreme Court has interpreted § 9–516 to prohibit competition between a municipal utility service and a utility owned by another municipality. *See City of Mesa v. Salt River Project Agricultural and Power District*, 92 Ariz. 91, 373 P.2d 722 (1962), *appeal dismissed*, 372 U.S. 704, 83 S.Ct. 1018, 10 L.Ed.2d 124 (1963). § 9–516(B) assures a municipality the right to acquire the facilities of any public service corporation by eminent domain.

Even though Scottsdale obtained the right to service the Johns project property via the Glass Door Agreement, it did not acquire or seek to acquire the facilities which Phoenix had previously used to provide water to the residence which had been located on the property. According to affidavits and maps offered by Community Builders below, several eight-inch Phoenix water mains run adjacent to the property, and a stubbed one-inch water line still runs onto the property.

Finding itself blocked by the Glass Door Agreement from obtaining a feeless hookup from Phoenix, Johns grudgingly paid the $137,600 hookup fee to Scottsdale, and subsequently filed its complaint in the present case. After reciting the pertinent facts, the complaint alleged four counts of violating the Sherman Act, and one count of violating Arizona's antitrust act, A.R.S. § 44–1401 *et seq.* Under the Sherman Act counts, Johns alleged an illegal horizontal division of territory, a concerted refusal to deal, an illegal tying arrangement in Scottsdale's refusal to issue a building permit without payment of a hookup fee, and attempt to monopolize on the part of Scottsdale. After title to the property passed to Community Builders pursuant to a financing arrangement, it was substituted as plaintiff. Community Builders' appeal followed the granting of the Cities' motions for summary judgment, and the denial of its motion for summary judgment.

## II. ISSUES ON APPEAL

We address the following issues on this appeal:

1). Whether the defendants' allegedly anticompetitive activities substantially affected interstate commerce;

2). Whether Phoenix and Scottsdale are immune from suit for their division of the service area territory; and

3). Whether Scottsdale's requirement that a hookup fee be paid prior to the issuance of a building permit constitutes an illegal tying arrangement under the Sherman Act.

## III. DISCUSSION

### A.) *Interstate Commerce*

■ The district court's terse judgment dismissing Community Builders' complaint did not specify the ground for dismissal. Community Builders reads the judgment as assuming jurisdiction and dismissing on substantive grounds. Community Builders argues that because the Cities did not appeal from that portion of the judgment which it reads as impliedly finding jurisdic-

---

town, or which renders utility service without its boundaries, shall not discontinue such service, once established, as long as such city or town owns or controls such utility. A city or town which renders utility service outside of its boundaries as prescribed by this subsection shall not be prohibited from selling a part of its utility operation to another utility which operates under regulations prescribed by law.

"D. It is declared the public policy of the state that when a city or town has purchased the property or plant of a public utility serving in an area within or without the boundaries of the city or town pursuant to this article, the corporation commission shall not be authorized or empowered to grant a new certificate of convenience and necessity or franchise to any person, firm or corporation to provide the same kind of public utility service within the area or territory previously authorized to said public utility under its certificate of convenience and necessity or franchise, but if the city or town refuses to provide utility service to a portion or part of the area or territory previously authorized to the public utility, the corporation commission may issue a new certificate of convenience and necessity or franchise to a public utility to provide utility service in that portion or part of the area or territory."

tion, they may not now raise the issue whether a sufficient nexus with interstate commerce has been established. The Cities argue that the district court likely relied upon a finding that their activities did not substantially and adversely affect interstate commerce, and ask us to affirm on that basis. Because we find that the record clearly established the requisite nexus with interstate commerce, we find it unnecessary to resolve the parties' quibbling over the proper interpretation of the judgment.

Community Builders argues that its affidavits proffered below established that the requirement of the hookup fee had a substantial effect upon considerably large amounts of financing which Johns obtained from out-of-state sources. According to the affidavit of David R. Johns, the president of David R. Johns, Inc., the project property was purchased from Industrial National Bank of Rhode Island for $1,000,000 in August, 1977. In September, 1977, the corporation entered into an agreement with three California investors whereby the investors would provide the purchase money, and then purchase the finished apartment complex for $7,007,500. After these arrangements were made, the project began to run into financial difficulties caused partly by the payment of the water hookup fee. Industrial National Bank was twice paid the sum of $6,667.67 as consideration for extending the time to make purchase payments while a solution was sought to the water hookup problem. Johns eventually obtained an agreement from the California investors whereby the hookup fee was included in the purchase price of the complex. Interim construction financing was provided by Valley National Bank of Arizona in the amount of $7,125,000. Permanent financing in that amount was eventually obtained from the Metropolitan Life Insurance Company of San Mateo, California. According to a separate Johns affidavit, Metropolitan Life has also financed the water hookup fee, and will eventually receive around $315,000 on its advancement of the fee. Johns projects that 65% of the project's first year revenues will be received from out-of-state sources, while approxi-

mately 35% will be received from out of the state in each year thereafter. An affidavit authored by Tom Grassl, a construction supervisor for Community Builders, indicates that over $2,000,000.00 worth of building materials will be supplied from outside of Arizona during construction of the project. None of these facts has been disputed by the Cities.

■ We will find that an antitrust defendant's activities have a sufficient nexus with interstate commerce to involve Sherman Act jurisdiction where they can be shown as a practical matter of economics to have had a not insubstantial effect on the line of commerce involved. *E. g., McLain v. Real Estate Board of New Orleans*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). The Supreme Court has indicated that a business restraint which affects a business purchasing a substantial amount of supplies from out-of-state sources and obtaining out-of-state financing for an expansion project may be deemed to "affect" interstate commerce. *See Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). An effect can be "substantial" even if the alleged restraint falls far short of causing a business concern to fold. *Id.* at 745, 96 S.Ct. at 1852–1853.

In *Western Waste Service v. Universal Waste Control*, 616 F.2d 1094 (9th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980), we held that a substantial effect upon interstate commerce had been established where, in combination with other factors, the plaintiff demonstrated that it spent $88,335 and $124,007 in consecutive years on out-of-state purchases. We there noted that if the defendant's alleged attempt to drive the plaintiff out of business were to succeed, the out-of-state purchases would be eliminated.

■ Community Builders' affidavits adequately demonstrated that the Cities' alleged Sherman Act violations have substantially affected interstate commerce. This is not a case like *Thornhill Publishing Company, Inc. v. General Telephone & Electronics*,

594 F.2d 730 (9th Cir. 1979), wherein the plaintiff offered only conclusory and non-specific affidavits to back up its claim that interstate commerce had been affected. Community Builders has here offered evidence of a definite impact with specific dollar amounts. A multimillion dollar project dependent largely upon out-of-state financing has been hit with an additional expense which will surely affect the quality of the investment itself. We think it unnecessary under *Hospital Building Co., supra*, that Community Builders demonstrate that the success of the project has been endangered. It need demonstrate only that interstate commerce has been substantially and adversely affected. The affidavits it submitted have satisfied that standard.

### B.) State Action Immunity

The Cities argue that their division of water service territory and Phoenix' consequent refusal to deal are activities shielded from antitrust liability under the "state action" doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The Cities claim they acted pursuant to a legislatively-mandated policy expressly forbidding competition in the provision of utility services, and therefore must be regarded as immune. Community Builders argues that because Scottsdale did not acquire the "used and useful" water lines in the immediate vicinity of the project property belonging to Phoenix, the two municipalities did not follow the dictates of A.R.S. § 9–516, and consequently were not acting under state compulsion.

The doctrine that parties who act under direction of state government should not be liable under the federal antitrust laws was first spelled out in *Parker v. Brown, supra*. In *Parker*, the Supreme Court held that a California raisin marketing program enforceable by criminal prosecution was immune to attack under the Sherman Act. The Court reasoned that because the Sherman Act was not intended to prohibit state governmental action, a program administered in detail by the state itself cannot be subject to attack as an unreasonable restraint of trade. *Id.* at 352, 63 S.Ct. at 314. The *Parker* majority noted that under our dual system of government, ". . . an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Id.* at 351, 63 S.Ct. at 313.

The Supreme Court recently broke a decades-long period of silence over the *Parker v. Brown* doctrine with a flurry of decisions which speak to the immunity question in one manner or another. *See California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978); *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Cantor v. Detroit Edison Corp.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

While the Supreme Court's most recent discussions of *Parker v. Brown* have raised several new questions regarding the applicability of the doctrine of state action immunity, *see generally* 7 Von Kalinowski, Antitrust Laws and Trade Regulation § 46.-03, we are concerned here solely with the issue of a municipality's immunity for activities in connection with the provision of utility services. The Supreme Court addressed that very issue in *Lafayette v. Louisiana Power & Light Co., supra*, a decision we are obliged to rely rather heavily upon here.

In *Lafayette*, two cities which operated electric utility systems brought an antitrust action against a private utility company. The private company counterclaimed, citing a number of anticompetitive acts in which the cities had allegedly engaged. A majority of the Court rejected the cities' contention that their status as municipalities shielded them *per se* from prosecution under the federal antitrust laws, a proposition not debated here. A four-Justice plurality, however, went on to describe a test for

determining whether a municipality's activities fall within *Parker v. Brown*. The plurality wrote that:

"... the fact that municipalities, simply by their status as such, are not within the *Parker* doctrine, does not necessarily mean that all of their anticompetitive activities are subject to antitrust restraints. Since '[m]unicipal corporations are instrumentalities of the State for the convenient administration of government within their limits' ... the actions of the municipalities may reflect state policy. We therefore conclude that the *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, *or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service*." (citation omitted) (emphasis added)

435 U.S. at 413, 98 S.Ct. at 1137.

Chief Justice Burger, concurring in the judgment, wrote separately and proposed an additional element to municipal immunity. The Chief Justice, quoting from *Cantor v. Detroit Edison, supra*, 428 U.S. at 597, 96 S.Ct. at 3121, would also require that the municipality prove that the implied exemption in a given case " 'was necessary in order to make the regulatory Act work, "and even then only to the minimum extent necessary." ' " 435 U.S. at 426, 98 S.Ct. at 1143.

In applying the test supplied by the *Lafayette* plurality, we inquire whether the actions of the Cities in dividing water service territory constituted conduct engaged in pursuant to state policy to displace competition with monopoly public service. Community Builders does not dispute that Arizona has an explicit policy prohibiting competition between municipalities in the provision of utility service. Nor does Community Builders question the legitimacy of the state interest in preventing such competition. Rather, Community Builders argues that the cities did not comply with the terms of § 9–516 because Scottsdale did not acquire any portion of the system which Phoenix had previously used to service the

property, nor did it acquire any Phoenix water lines in the area which might be used to provide service to the property. § 9–516(A) reads:

"It is declared as the public policy of the state that when adequate public utility service under authority of law is being rendered in an area, within or without the boundaries of a city or town, a competing service and installation shall not be authorized, instituted, made or carried on by a city or town <u>unless or until that portion of the plant, system and business of the utility used and useful in rendering such service in the area in which the city or town seeks to serve, has been acquired</u>." (Emphasis added)

Community Builders relies upon the underscored portion of the statute. By affidavit and map it has identified several Phoenix-owned water lines in the immediate vicinity of the project property which it claims fall under the definition of "used and useful," and which Scottsdale failed to acquire at the time of the Glass Door Agreement. The Cities dispute that these lines can be regarded as "used and useful." An affidavit submitted by Phoenix indicates that Scottsdale has purchased an eight-inch water line located to the south of the property.

We find it unnecessary to resolve the dispute over the "used and useful" language because we feel that compliance with that portion of the statute was not a prerequisite to a claim of immunity under *Lafayette*. § 9–516, as interpreted by the Arizona Supreme Court, is concerned primarily with the elimination of competition between municipal utility services and other utility providers. *See City of Mesa v. Salt River Project, supra*.

Public utility water companies have traditionally been regarded as natural monopolies because of the economic waste resulting from duplicate service facilities. By enacting § 9–516, Arizona has adopted a specific declaration of policy recognizing the status of utilities as natural monopolies. No claim is made that the water service provided by Scottsdale in the area in which the Johns

project is located is not "adequate"; even if it were, that would be an issue for the Arizona regulatory authorities, not the federal courts. So long as that service is adequate, Arizona law prohibits the institution of a competing service, i. e., by Phoenix.

Inasmuch as Arizona law thus "displaces competition with . . . monopoly" in these circumstances, it is immaterial that the two prospective providers of water service entered into an agreement allocating territory. Under the *Parker* doctrine, as elucidated by *Lafayette*, that kind of "anti-competitive conduct" is exempt from the antitrust laws, given the Arizona policy.

Community Builders seeks to avoid the plain effect of the statute by pointing to that provision of the statute dealing with acquisition of existing service facilities in the area proposed to be served. The purpose of the acquisition proviso is simply to implement the anti-competition policy by requiring that a municipal utility, if it does wish to enter an area then receiving adequate service, purchase the existing useful service facilities, thereby preventing construction of duplicate facilities. This proviso obviously is not intended to qualify or restrict the anti-competition policy enunciated in the first part of this section; on the contrary, it reinforces it.

■ While Phoenix owns some perhaps useful facilities in the Scottsdale service area, it is not providing service, adequate or otherwise, in that area. This proviso therefore has no application. But even if it did, the beneficiary would be Phoenix, i. e., it alone would have a right to require that Scottsdale purchase its facilities. Obviously, by virtue of the Glass Door Agreement, it has chosen not to assert whatever rights it might have. The fact, however, that this section gives some rights to an existing utility to implement the prohibition against competition gives no standing to a consumer to assert any expectation in competition between utilities.

In short, this proviso has nothing to do with this case. Accordingly, we affirm the dismissal of Community Builders' complaint as to the counts relating to an alleged hori-

zontal division of territory, an alleged refusal to deal by the Cities, and Scottsdale's allegedly illegal attempt to monopolize.

## C.) *Tying Arrangement*

■ Community Builders has alleged that Scottsdale's conditioning of the issuance of a building permit upon payment of a water hookup fee constitutes an illegal "tying" arrangement under the Sherman Act. Scottsdale has raised a variety of objections to this contention.

■ We have identified three elements of an illegal tying arrangement under the Sherman Act: (1) a tying arrangement between "two distinct products or services"; (2) the defendant must have "sufficient economic power in the tying market to impose significant restrictions in the tied product market"; (3) "the amount of commerce in the tied product market must not be insubstantial." *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207 (9th Cir. 1977). Here, Community Builders argues that the "tying" product was the building permit, while the "tied" product was the water hookup.

Whatever else might be said against Community Builders' theory, it is clear to us that it must fail because there is no "line of commerce" in the provision of water services. As our discussion in III.B., *supra*, established, there is no competitive market for water services in Arizona, at least where a municipality chooses to provide water. It is not as if Community Builders could have gone to Phoenix, Tempe, Flagstaff, or any other municipality and obtained a water hookup. There simply was no market for Scottsdale to restrain. Accordingly, we are constrained to hold that Scottsdale was entitled to judgment as a matter of law on the allegation of an illegal tying arrangement.

## IV. CONCLUSION

The defendants City of Phoenix and City of Scottsdale were each entitled to judgment as a matter of law on the facts in the record.

Accordingly, the district court's judgment is

AFFIRMED.