**TURF PARADISE, INC., an Arizona corporation, Plaintiff-Appellant,**

v.

**ARIZONA DOWNS, an Arizona corporation, Defendant-Appellee.**

No. 80–5185.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 12, 1981.

Decided Jan. 7, 1982.

As Amended Feb. 26, 1982.

Certiorari Denied June 1, 1982.
See 102 S.Ct. 2308.

David L. White, Phoenix, Ariz., for plaintiff-appellant.

Roger T. Hargrove, Phoenix, Ariz., argued, for defendant-appellee; Elias M. Romley, Phoenix, Ariz., on brief.

Before WRIGHT, SNEED, and POOLE, Circuit Judges.

SNEED, Circuit Judge:

Turf Paradise, Inc. (Turf), an Arizona corporation that owns and operates the Turf Paradise race track in Phoenix, Arizona, filed this private antitrust action against Arizona Downs (Downs), an Arizona corporation that leases and operates the Turf Paradise track for half of the racing season, alleging violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Turf contended that a provision of the lease between Turf and Downs that sets forth the manner in which Turf and Downs

will apply to the Arizona Racing Commission for racing dates is a horizontal restraint of trade among competitors and, consequently, a *per se* violation of the federal antitrust laws. Turf sought declaratory and injunctive relief, as well as damages, costs, and attorney's fees.

The district court on November 16, 1979 granted Downs' motion for partial summary judgment finding that Turf, as an original participant to the two-party agreement, was barred from receiving damages under the defense of *in pari delicto.* On the same date the district court denied Turf's motion for partial summary judgment which sought to have declared the date allocation provisions in the lease void as. a *per se* violation of the Sherman Act. Thereafter, on January 28, 1980, the district court invoked the abstention doctrine and dismissed the action in deference to a prior filed state action brought by the Arizona Horsemen's Foundation, Inc. (AHF), challenging the same lease on the grounds that the exclusivity clause of the lease violates the Arizona antitrust laws, and that the preferences given existing holders of racing permits under Arizona law violates equal protection. The district court's dismissal of January 29, 1980 can be read as also relying upon the antitrust immunity provided by *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Turf timely appeals both the grant of partial summary judgment and the dismissal.

We affirm both actions of the district court on grounds somewhat different than those articulated by that court. That is, we hold that the date allocation provisions are not a *per se* violation of the Sherman Act and that, should we be in error in this respect, the provisions are immune from attack under *Parker v. Brown, supra.* In so holding, we reject the contentions of Downs that the district court lacked subject matter jurisdiction and that, if jurisdiction existed, the district court properly abstained from exercising it. We refrain from deciding other issues raised by the parties.

## I.

### STATEMENT OF THE CASE

Turf and Downs have both been engaged in the business of conducting horse racing meetings in Maricopa County, Arizona for a number of years. Prior to 1954 both Turf and Downs (then operating under its predecessor name of Ingleside Turf Club) each had its own race track. At the time Turf was planning to build a new track and Downs was planning to enlarge its existing facility. In 1954 both parties applied to the Arizona Racing Commission for permits to hold racing meetings on some of the same days, thus resulting in a conflict that the Arizona Racing Commission was going to have to resolve. Litigation resulted from this conflict. On September 20, 1954, Turf wrote to Downs suggesting that "a direct conflict in racing dates exist[ed and that that resulted in a condition that was] very detrimental to the better interests of racing and [could] only lead to confusion and an inferior type of horse racing." In order to avoid "this undesirable situation," Turf proposed that Turf and Downs divide use of Turf's soon to be completed race track—the present Turf Paradise facility. A copy of this letter was delivered to the Arizona Racing Commission.

In 1956 the Arizona Legislature enacted Ariz.Rev.Stat. § 5–108.01, effective July 14, 1956, that provided a regulatory method for settling conflicts in applications for racing dates within the same county. It defined a conflict as any time "two or more applications [seek] racing permits to conduct racing on the same day or dates within the same county." Ariz.Rev.Stat. § 5–108.-01(A). It further provided that when a conflict existed, "applicants shall attempt to resolve such conflict by an agreement in writing in which agreement each such applicant shall receive and be allocated dates in such manner as will eliminate such conflict." Ariz.Rev.Stat. § 5–108.01(B). Such agreements were to be filed with the Arizona Racing Commission and the Commission would hold hearings to allocate the days only in the event that an agreement could not be reached. Ariz.Rev.Stat. § 5–108.-01(B) & (C).

On October 9, 1956, after the effective date of section 5–108.01, Turf and Downs signed a twenty-year lease, granting a leasehold interest to Downs for use of the Turf Paradise track for one-half of the racing season. The lease also contained two twenty-year option periods, the first of which was exercised by Downs in 1976. The lease contains the following provision that is the subject of the present controversy:

> The parties hereto recognize that heretofore the total racing dates legally available to the parties hereto have been applied for and allocated substantially equally between [Turf] and [Downs], or the (sic) predecessors. The parties hereto agree that during the term of this agreement the total number of racing dates legally available to the parties hereto in a racing season shall be divided equally, one-half (½) thereof to [Turf] and one-half (½) thereof to [Downs]. The term "racing season" as used herein means that period of time beginning with the first day allocated by the Arizona Racing Commission at its meeting each year for horse racing at [Turf's] racing plant and ending with the last day so allocated. The parties hereto agree that unless they otherwise mutually agree, they will alternate each year in applying for the racing days in the first half and in the last half of each racing season, with [Turf] to apply only for the racing days in the first half of the next racing season beginning after July 1, 1957, and [Downs] to apply only for the racing days in the last half of said racing season.

The 1956 version of section 5–108.01 dealing with conflicts in racing dates was repealed in 1968. Section 5–110(A) was adopted to replace it and provided that when a conflict existed, current holders of permits would be given preference for those dates they had had permits for in previous years. It specifically recognized that if there was an agreement among different applicants calling for them to alternate racing dates, the holders of permits would receive preference over other applicants in accordance with the alternating provisions of the agreement. Ariz.Rev.Stat. § 5–110(A) (West 1974 & Supp. 1980–81).

Aside from the above-mentioned statutory provisions, horse racing is subject to considerable regulation in Arizona. The Arizona Racing Commission is empowered to, *inter alia*, issue racing dates, regulate and supervise all racing meetings, inspect racing sites, promulgate regulations governing racing meetings to promote "public health, safety, and proper conduct of racing and pari-mutuel wagering," and supervise pari-mutuel racing. Ariz.Rev.Stat. § 5–104 (West 1974 & Supp. 1980–81). Permit applications must include a statement of the location at which and dates on which the racing meetings are to be held, as well as a statement as to whether the plant is leased or owned. Ariz.Rev.Stat. § 5–107 (West 1974 & Supp. 1980–81). A permit is necessary to hold a racing meeting, and a permit will only be issued to an owner or a lessee of a racing track. Ariz.Rev.Stat. §§ 5–107.-01 and 5–107.02 (West 1974 & Supp. 1980–81). The Commission is required to "conduct a thorough investigation concerning an application for a permit," and may refuse to issue a permit if such refusal is warranted based on a review of the applicant's moral character, if issuing the permit is not in the "best interest of the safety, welfare, economy, health and peace of the people of the state," or for other enumerated reasons. Ariz.Rev.Stat. § 5–108 (West 1974 & Supp. 1980–81). However, if the applicant meets the requirements for the issuance of a permit, it shall be issued. Ariz.Rev.Stat. § 5–108(C) (West 1974 & Supp. 1980–81). No new racing permits shall be issued after February 1, 1971 unless the Commission determines that issuance of the permit is in the public interest, is economically feasible, and in the best interest of horse racing. Ariz.Rev.Stat. § 5–108.01 (West 1974 & Supp. 1980–81). All challenges to the issuance, or failure to issue, a new permit are to be made in the Superior Court of Maricopa County. Ariz.Rev.Stat. § 5–108.01(B) (West 1974 & Supp. 1980–81). Finally, both the number of permits that a single entity can own in the state and in the largest counties are limited, and the number of racing days allowed in a particular year, are

limited. Ariz.Rev.Stat. §§ 5–108.03 and 5–110(A) (West 1974 & Supp. 1980–81). In Maricopa County the number of available race days is currently 150.

■ A third racing entity, AHF, has applied to the Commission for a permit to conduct racing meetings at the Turf Paradise track on those days for which the track is now leased to Downs. AHF, as already noted, filed a state court action, prior to the filing of the instant action, claiming state antitrust violations resulting from the current lease agreement between Turf and Downs because of the exclusivity provisions of the lease, as well as a constitutional challenge to the preference provisions of section 5–110(A).[1] Turf and AHF have also submitted to the Commission a proposed five-year lease between Turf and AHF, which contains more favorable financial terms for Turf than does the current lease with Downs, but does not contain a specific requirement that Turf and AHF apply for specific days. Rather, they agree to lease the plant to AHF for those days that the Commission awards it a permit to conduct racing meets. Turf would be under no obligation to enter into a new lease with AHF at the end of the five-year period.

## II.

### DISTRICT COURT JURISDICTION—INTERSTATE COMMERCE

Downs contends that the district court lacked subject matter jurisdiction over the antitrust claims because the "conduct complained of" does not "affect" interstate commerce. We disagree.

■■ The interstate commerce requirement may be satisfied under either the "in commerce" theory or the "effect on commerce" theory. *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980). The present action easily satisfies the "effect on commerce" test. To meet the "effect on commerce" test, Turf need only allege that the local activity of horse-racing has a substantial effect on interstate commerce, not the "more particularized showing" that the alleged illegal conduct, the lease provision, has a substantial effect on interstate commerce. *McLain*, 444 U.S. at 242–43, 100 S.Ct. at 509–510. *Accord, Community Builders, Inc. v. City of Phoenix*, 652 F.2d 823 at 827 (9th Cir., 1981); *Palmer v. Roosevelt Lake Log Owners Ass'n*, 651 F.2d 1289 at 1291 (9th Cir., 1981); *Western Waste Service v. Universal Waste Control*, 616 F.2d 1094, 1097 (9th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980). *But see Crane v. Intermountain Health Care, Inc.*, 637 F.2d 715, 721–24 & n.3 (10th Cir. 1980) (en banc) (disagreeing with *Western Waste Service*'s interpretation of *McLain* that the conduct need not affect interstate commerce).[2] There must be a "sufficient nexus" between the activity and interstate commerce so

1. The Arizona Supreme Court's decision in the state case was filed after oral argument. That court held the lease agreement did not run afoul of the state antitrust law because it had been authorized in another, more specific, Arizona statute and the authorization was not unconstitutional. *Arizona Downs v. Arizona Horsemen's Foundation*, 130 Ariz. 550, 637 P.2d 1053 (Ariz. 1981). In arriving at its conclusion, the Arizona Supreme Court noted that its analysis of the state antitrust claim is inapplicable to federal antitrust claims. *See id.*, 130 Ariz. at 559–560, 637 P.2d at 1062–1063 & n.3.

Agreeing with the latter conclusion, we conclude that the principle of res judicata is not a bar to our proceeding. Unlike the situation in *Nash City Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484 (4th Cir. 1981) (which held that a state antitrust judgment may bar a federal antitrust

action), we are not confronted with a configuration of "like statutes of two separate jurisdictions," which condemn "the same wrong." *Id.* at 490. Indeed, the Arizona Supreme Court's decision conclusively established that the lease agreement was outside the ambit of the state antitrust law. It, therefore, is unnecessary for us to decide at this time whether this circuit should adopt the holding in *Nash*.

2. As the Supreme Court noted in *McLain*, to accept Downs' argument would mean that failure of an alleged restraint to succeed would bar an action. 444 U.S. at 243, 100 S.Ct. at 509–510. Because the Sherman Act bases liability on proof of either "an unlawful purpose" or "an anticompetitive effect," such cannot be the jurisdictional test. *Id.* Rather, success of an illegal restraint would only affect the measure of damages.

that it can be said "as a practical matter of economics" there is "a not insubstantial effect on the line of commerce involved." *Community Builders*, 652 F.2d at 827 (citing *McLain*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441).

■ The "sufficient nexus" exists. Affidavits in the record disclose at a minimum that (1) approximately 50% of the owners and trainers at the track are non-residents, (2) more than 40% of the horses stabled at the track are from out-of-state, (3) more than 40% of the patrons are non-residents, (4) over two-thirds of the jockeys are out-of-state residents, (5) the food and beverage concessionaires at the track, a Delaware corporation, has had sales of more than $1,500,000 per year, and (6) numerous other companies that provide contractual services to the track are foreign corporations. These facts have never been challenged by Downs. These facts establish the requisite nexus and distinguish this case from *Thornhill Publishing Co., Inc. v. General Telephone & Electronics*, 594 F.2d 730 (9th Cir. 1978), where only conclusory and non-specific affidavits were filed. *See Community Builders*, 652 F.2d at 827–828. Consequently, the district court had jurisdiction over the action. It is not necessary to determine if the action also satisfies the "in commerce" test.

### III.

### ABSTENTION

The district court appears to have dismissed the action on abstention grounds. After noting that the merits of the case were intertwined with the issue of legalized gambling, that there is extensive state regulation of horse racing in Arizona, that Arizona had a greater interest in the controversy than did the federal government, and that resolution of a prior filed state action might dispose of the instant case, the district court stated that "[t]he proper course for the Court to take in this action is to abstain from further consideration of the matter. *See County of of (sic) Allegheny v.*

*Frank Mashuda Co.*, 360 U.S. 185, 79 S.Ct. 1060 [3 L.Ed.2d 1163] (1959)."

■ Although a stay of the proceedings, rather than dismissal, is the normal result of a decision to abstain, in unusual situations dismissal may be appropriate. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 818–19, 96 S.Ct. 1236, 1246–1247, 47 L.Ed.2d 483 (1976); *International Brotherhood of Electrical Workers, Local Union No. 1245 v. Public Service Commission*, 614 F.2d 206, 213 (9th Cir. 1980); *Tovar v. Billmeyer*, 609 F.2d 1291, 1293 (9th Cir. 1979). Abstention, however, is an "extraordinary and narrow exception" that will normally be appropriate only when the consequences of exercising jurisdiction clearly outweigh the obligation to adjudicate suits over which the federal courts have jurisdiction, and dismissal is warranted only by the "clearest of justifications." *Colorado River*, 424 U.S. at 813, 817–19, 96 S.Ct. at 1244, 1246–1247; *Tovar*, 609 F.2d at 1293. Because it involves the discretionary exercise of a court's equity powers, it is reviewed only for an abuse of discretion. *Pue v. Sillas*, 632 F.2d 74, 78 (9th Cir. 1980).

■ There are three general categories of abstention, as well as a fourth category that is closely related to abstention, but is not, properly speaking, a type of abstention. The first, *Pullman* abstention, is not appropriate here because no federal constitutional issue would be avoided by deferring to the state court action inasmuch as no federal constitutional issue is presented in this case. *See Colorado River*, 424 U.S. at 814, 96 S.Ct. at 1244 (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. at 189, 79 S.Ct. at 1063); *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *L. H. v. Jamieson*, 643 F.2d 1351 (9th Cir. 1981); *Pue v. Sillas*, 632 F.2d at 78–81; *Spokane Arcades, Inc. v. Brockett*, 631 F.2d 135 (9th Cir. 1980).

■ The second, *Younger* abstention,[3] is likewise not appropriate because a decision

---

**3.** Strictly speaking, *Younger* abstention is appropriate where, absent bad faith, harassment,

on the federal antitrust claims would neither "restrain" any state court proceeding, nor interfere in any way with the resolution of the issues presented in the prior filed state court action.

■ The third, *Burford* abstention, is equally inapplicable. *See Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *International Brotherhood of Electrical Workers*, 614 F.2d at 208-12. The purpose of *Burford* abstention is to avoid "federal intrusion into matters which are largely of local concern and which are within the special competence of local courts." *International Brotherhood of Electrical Workers*, 614 F.2d at 212 n.1.

It is likely that the district court had *Burford* abstention in mind when it dismissed the present action. The district court referred to the extensive state regulatory system of horse racing and to the paramount nature of the state's interest in gambling. Also, as in *Burford*, Arizona has concentrated challenges to the denial of permits in the Superior Court of Maricopa County, presumably to allow for a development of special competence in that court. *Cf. International Brotherhood of Electrical Workers*, 614 F.2d at 210 (failure to concentrate challenges to the Public Service Com-

mission's authority in a single court was cited as a factor arguing against *Burford* abstention). Nonetheless, as in *International Brotherhood of Electrical Workers*, the federal issues are separable from the state issues.

■ While it is possible that the exercise of federal jurisdiction over the federal antitrust claims might lead to a result in conflict with that of a state court decision on the state antitrust claims, the mere "potential" for such conflicts does not require abstention. *Colorado River*, 424 U.S. at 815-16, 96 S.Ct. at 1245-1246. The key question is whether the potential conflict would impermissibly impair the state's effort to effect its policy with respect to horse racing and gambling. *Id.* at 816, 96 S.Ct. at 1245-1246. Here, success on the federal antitrust claim by Turf might remove Downs as a competitor as a result of voiding the lease, but that would neither affect the availability of the Turf Paradise race track for horse racing, nor impermissibly obstruct the regulation of gambling by the Arizona Racing Commission.[4]

■ The fourth category, the close relative of abstention, may be referred to as the "wise judicial administration" exception to the exercise of jurisdiction. *See Colorado River*, 424 U.S. at 817-18, 96 S.Ct. at 1246-1247; *Tovar v. Billmeyer*, 609 F.2d 1293. Under this exception, a federal court will defer to a state court when failure to do so

or a patently invalid state statute, federal jurisdiction is being invoked for the purpose of restraining a state criminal proceeding. *Colorado River*, 424 U.S. at 816, 96 S.Ct. at 1245; *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). It has subsequently been expanded to include some civil proceedings, *e. g.*, state nuisance proceedings antecedent to a criminal prosecution for exhibiting obscene films, *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); collection of state taxes, *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943); attempt to restrain a receivership imposed in an ongoing state court proceeding, *Worldwide Church of God, Inc. v. California*, 623 F.2d 613, 615 (9th Cir. 1980). In essence, concerns of federalism and comity compel a

party to exhaust their state court remedies before seeking federal relief. *Worldwide Church of God*, 623 F.2d at 615.

4. Indeed, it is entirely possible that the Commission could effectively force Turf to rent the track to another party should it deem it preferable to have another entity operate the track some of the time by simply denying Turf a permit to race on those days now reserved for Downs. Alternatively, there is nothing theoretically stopping Downs from building its own track in Maricopa County and applying again to the Commission for racing permits. Moreover, it is arguable that the application of *Burford* abstention is particularly inappropriate in the context of a federal antitrust claim.

would waste judicial resources.[5] The exception is invoked when both the federal and state courts have concurrent jurisdiction over particular claims.

It is inapplicable in the present case. There is no concurrent state and federal jurisdiction over the federal antitrust claims. The federal courts have exclusive jurisdiction over federal antitrust claims. 15 U.S.C. § 15.[6] Consequently, the dismissal of the action on abstention grounds was improper. The district court abused its discretion by invoking abstention. The factors necessary to invoke abstention were not present. *See Pue,* 632 F.2d at 78.

## IV.

### DATE ALLOCATION PROVISIONS NOT A PER SE VIOLATION

Although the district court did not decide whether the date allocation provisions of the lease were a *per se* violation of the Sherman Act, the issue was fully briefed and argued before the district court as well as before this court. This court often invokes its discretion to affirm on any ground supported by the record, *e. g., United States v. County of Humboldt,* 628 F.2d 549, 551 (9th Cir. 1980), and the Supreme Court has recognized that "there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt." *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (citing *Turner v. City of Memphis,* 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962)).

Because of these authorities and the thoroughness of the presentation of the positions of the respective parties, we address the crucial issue in this case. That issue is, were the date allocation provisions *per se* violations of the Sherman Act?

To support its position, Turf relies primarily on *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), in which it was held that "horizontal restraints" between competitors at the same level of the market structure to allocate market territories were *per se* violations of the Sherman Act without regard to their reasonableness. The issue is whether the date allocation provisions constitute such a "horizontal restraint." We hold that they do not.

We acknowledge, of course, that Turf and Downs are competitors at the same level of the market structure. The date allocation provisions, however, do not achieve a territorial allocation between competitors, at least some of whom could, but for the agreement, operate simultaneously within that area to which another is given exclusive rights. Rather, the date allocation provisions achieve a temporal allocation to a competitor of the use of a facility owned by another competitor under circumstances in which it is not possible to have simultaneous use by both. To strike down a territorial allocation manifestly promotes competition, at least among the competitors who are parties to the agreement, while to strike down the temporal allocation under the circumstances of this case does not clearly promote competition. Counsel for Turf in the hearings before the district court acknowledged that elimination of the date allocations provisions could lead to invalidation of the entire lease because of the non-severability clause of the lease. Reporter's Transcript, Vol. 2, at 38–42, 74. As a consequence, Turf could exclude Downs, as well as all others, from the use of the track except on terms acceptable to it. To

---

**5.** This exception is distinct from *Pullman, Younger,* or *Burford* abstention, and the circumstances in which it is appropriate are considerably more limited. *Tovar,* 609 F.2d at 1293 (citing *Colorado River,* 424 U.S. at 818, 96 S.Ct. at 1246–1247).

**6.** *Cf. Weiner v. Shearson, Hammill & Co., Inc.,* 521 F.2d 817, 821–22 & n. 22 (9th Cir. 1975)

(noting that normally abstention would be inappropriate when the federal court has exclusive jurisdiction over federal securities claims, but that when such claims are also pleaded as affirmative defenses to an otherwise identical state action, abstention might be appropriate because the state court could decide the federal securities issues).

employ a *per se* rule to foster increased control by Turf of a facility, access to which is necessary, at least in the short run, to conduct racing in the Phoenix metropolitan area, is a somewhat unusual way to promote competition.

To focus on the extent to which Turf's argument, if accepted, would increase Turf's power with respect to a facility necessary to conduct horseracing helps to clarify the proper manner in which this case should be regarded for antitrust purposes. The issue, properly speaking, is whether an agreement between competitors at the same level of the market structure to share temporally the use of a facility necessary to the conduct of their business is a *per se* violation of the Sherman Act. So far as we have been able to discover it has never been held to be so.

It is true, as *United States v. Terminal R. Ass'n*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), and other cases indicate, *e.g., Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc.*, 194 F.2d 484, 487 (1st Cir. 1952); *see also Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 992–93 (D.C.Cir.1977); *United States v. Standard Oil Co.*, 362 F.Supp. 1331 (N.D.Cal.1972), *aff'd*, 412 U.S. 924, 93 S.Ct. 2750, 37 L.Ed.2d 152 (1973), that the sharing of an essential facility by two or more competitors accompanied by the exclusion of all other competitors may amount to a violation of the Sherman Act. Leaving aside the question whether a competitor who in fact shares the essential facility has standing to attack the arrangement, of which it is a beneficiary, on behalf of the excluded competitors, *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 211 (3d Cir. 1980), it is clear that Turf makes no such argument here. Its purpose in this case is to increase its control over the racing facility, not to increase the extent to which all competitors share in the use of the facility. We express no opinion

concerning the extent to which such an argument properly presented might be meritorious.

## V.

## STATE ACTION IMMUNITY

As an alternative to our holding in Part IV of this opinion, we hold that the date allocation provisions of the lease are immune from the reach of the antitrust laws under the doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

■ The doctrine of *Parker v. Brown* which provides that parties who act under the direction of a state government should not be liable under federal antitrust laws, is premised on the view that the Sherman Act was not intended to prohibit state regulation of business. Thus, action taken pursuant to a program administered in detail by the state itself is not an unreasonable restraint of trade. 317 U.S. at 352, 63 S.Ct. at 314. *Accord, Community Builders*, 652 F.2d at 828.[7]

The Supreme Court established two conditions that must exist before the exemption can apply: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *California Liquor Dealers v. Midcal Aluminum Co.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) (quoting *City of LaFayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978)). Applying these criteria, the Supreme Court in a recent case found that a state program that required state agency approval of the location of new automobile dealerships was immune under the state action exemption. *New Motor Vehicle Board of California v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978). The fact that agency hearings were initiated by an existing dealer was deemed

---

**7.** The *Parker v. Brown* state action doctrine should be distinguished from the related but different doctrine of implied immunity flowing from the passage or existence of other federal statutes. *See, e.g., National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City*, 452 U.S. 378, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1981).

immaterial in light of the state's active role and the "clearly articulated and affirmatively expressed" goal of the state policy to "displace unfettered business freedom in the matter of the establishment and relocation of automobile dealerships." *Id.* at 109, 99 S.Ct. at 411–412. Likewise, the Arizona prohibition against lawyer advertising was immune from federal antitrust regulation because of the "clear articulation of the State's policy with regard to professional behavior" and because such behavior was "subject to pointed re-examination by the policy maker—the Arizona Supreme Court—in enforcement proceedings." *Bates v. State Bar of Arizona,* 433 U.S. 350, 362, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977).

In contrast, the Supreme Court has rejected blanket state action immunity merely because some state regulation of the relevant business exists. *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). The purposes of the regulation must be to avoid the consequences of unrestrained competition in the market for which immunity is sought. *Id.* at 595, 96 S.Ct. at 3119. In *Cantor,* where the only articulated state policy dealt with the regulation of the distribution and sale of electric power, there was no immunity in the retail market for light bulbs merely because a state agency had approved, as part of a public utility tariff, the free distribution of light bulbs by the utility to its customers. The distribution of light bulbs was part of an unregulated market in the state. *Id.* at 584, 96 S.Ct. at 3114. The free distribution of light bulbs was initiated by the utility and the agency's role was that of mere passive acceptance. *Id.* at 583, 96 S.Ct. at 3114. Thus, the utility was responsible for its anticompetitive conduct. *Id.* at 593, 96 S.Ct. at 3119. Similarly, in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), mandatory fee schedules enforced by a state bar association were not immune from the Sherman Act because they were neither mandated by the state articulated policy that lawyers conduct themselves in an ethical manner, nor enforced by a state agency. *Id.* at 788–92, 95 S.Ct. at 2013–2015.[8]

In addition, to invoke the immunity the second requirement, viz., "active supervision," must exist. Thus, in *California Liquor Dealers* the Supreme Court found that a state liquor retail price maintenance system was not immune from the Sherman Act

---

**8.** Turf argues that *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975), requires that the conduct be "compelled" by the state acting as sovereign rather than merely "prompted." It appears that the statement in *Goldfarb* regarding compulsion refers to a combination of the criteria that there be both a clear articulation of state policy and active supervision by the state itself. 421 U.S. at 788–91, 95 S.Ct. at 2013–2015. In *Goldfarb* neither was present, and the opinion did not specifically separate the criteria. Thus, *Goldfarb* does not preclude a finding of state action immunity merely because of the presence of some private decision making pursuant to a clearly articulated state policy that is actively supervised by a state entity even though the supervision does not rise to the level of compulsion.

We recognize that other courts have found a "compulsion" requirement when reviewing conduct of "private" parties. *See, e.g., Northeastern Telephone Co. v. American Telephone and Telegraph Co.,* 497 F.Supp. 230, 237–38 & n.9 (D.Conn.1980). We find further support for our view that compulsion is not required in *Cantor.* Justice Stevens, when speaking for the Court in Section III of the opinion, *see* note 12, *infra,* noted that typically, regulated industries "involve a blend of public and private decisionmaking." 428 U.S. at 592, 96 S.Ct. at 3118 (footnote omitted). He noted that "state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity." *Id.* at 592–93, 96 S.Ct. at 3118–3119 (footnotes omitted). He went on to note the parallel problem of determining when state action for due process and equal protection purposes exists in the regulatory context. *Id.* at 594 n.31, 96 S.Ct. at 3119 n.31. He cited *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), which noted the importance of whether the private party initiated the challenged practice, and the degree to which the state agency puts "its own weight on the side of the proposed practice." *Id.* at 357, 95 S.Ct. at 456–457. Such an inquiry would be useless if state compulsion were the litmus test for antitrust immunity. Here, it was clearly the state legislature that initiated the practice, and thus the question must turn on the degree to which the state or its agency has put "its own weight on the side of [that] practice."

because, although it satisfied the first requirement that it be adopted pursuant to a clearly articulated and affirmatively expressed policy to displace competition, it was not actively supervised by the state. 445 U.S. at 105–06, 100 S.Ct. at 943–944. The state neither set the prices, reviewed them for reasonableness, nor regulated the contract terms. *Id.*

■ Application of these principles to the facts of this case is not without difficulty. Turf admits that the Arizona Legislature has clearly evidenced a policy to limit the number of days allowed for horse racing and that those days be allocated to the most qualified. Turf, however, argues that the articulated policy does not support "collusion between two private parties to eliminate competition between them in making application for available racing days." Turf claims that the Commission may allocate racing days only to those who apply for specific days, and that here there is no supervision of the allocation—rather it is decided solely by the provisions of the private lease agreement. Turf contends that the restraint fails to satisfy both of the conditions set forth by *California Liquor Dealers.* The first is not satisfied because the underlying public policy evidenced by the state's regulation is that racing dates be allocated to the most qualified applicants, not that they be allocated by private agreement. The second also is not satisfied. Turf claims the private date allocation is not actively supervised by the state.[9]

We cannot accept Turf's arguments. The state statute enacted in 1956 provided that private agreements between parties seeking conflicting dates in the same county would be recognized by the Commission. This statute was enacted prior to the time Turf and Downs entered into the challenged agreement. Thus, it was the stated policy of the Arizona Legislature that conflicts in dates be settled by the private parties and not by the Commission. Ariz.Rev.Stat. § 5–108.01 (1956). Moreover, notwithstanding this policy, it was and still is the duty of the Commission to assure that only qualified applicants were granted permits. *See, e.g.,* Ariz.Rev.Stat. § 5–104 (West 1974 & Supp. 1980–81) (issue racing dates, supervise racing meetings, inspect racing sites, promote the public health and safety); Ariz.Rev.Stat. § 5–107.03 (West 1974 & Supp. 1980–81) (review all financial information submitted by a permittee); Ariz. Rev.Stat. § 5–108(A) (West 1974 & Supp. 1980–81) (conduct a "thorough investigation concerning an application for a permit;" refuse issuance under specific grounds, *e. g.,* not in the best interests of safety, welfare,

---

**9.** Turf also argues in its brief that even if *Parker v. Brown* immunity were to apply in this case, that the "*Parker* defense can be raised only by a governmental entity that is a party to the lawsuit." Turf relies primarily on *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), for this proposition. *Id.* Turf misreads *Cantor,* and its position is unsupportable.

Justice Stevens authored the opinion in *Cantor.* In Part II he found that since the actions complained of were actions of private parties, albeit arguably under state compulsion, that *Parker* was inapplicable because it had involved actions of the state. 428 U.S. at 585–92, 96 S.Ct. at 3115–3118. Part II was accepted only by Justices Brennan, White, and Marshall, *id.* at 581, 96 S.Ct. at 3113, and consequently did not command a majority of the court. Part III, which did command a majority, then proceeded to analyze the relationship between the conduct of the private party and the state regulatory agency to determine if immunity was available nonetheless. *Id.* at 592–98, 96 S.Ct.

at 3118–3121. It concluded that immunity was not available under the facts of *Cantor. Id.*

The view expressed in Part II of *Cantor* that private conduct that is intertwined with state conduct cannot support an immunity defense for the private actor was implicitly rejected in *California Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). There, the Court specifically stated that it was considering "whether the State's involvement in the price setting program is sufficient to establish antitrust immunity under *Parker v. Brown.*" Thus, Turf's contention regarding *Cantor* is unsupportable. Moreover, *Cantor* cannot possibly be read to stand for the proposition that Turf asserts. Justice Stevens' opinion itself recognized that immunity might apply to conduct of private parties, albeit not under *Parker,* in Part III. 428 U.S. at 592–98, 96 S.Ct. at 3118–3121. Consequently, regardless whether immunity flows to private conduct under *Parker,* or under some other "regulatory" doctrine, it may still be available to a private party as a defense.

*economy*, health and peace of the people of the state). As noted by the district court, we must recognize that Arizona has a strong interest in the conduct of horse racing activities in the state because they are incident to legalized pari-mutuel wagering.

Taken together, the above statutory scheme articulates a policy "affirmatively and expressly" to replace unfettered competition in the application for racing dates (and consequently the right to run a gambling operation) with regulation. Further evidence of this articulated policy is that in 1967 the statute was amended to grant the current holders of permits a preference in the application process for racing dates. Ariz.Rev.Stat. § 5–110(A) (West 1974 & Supp. 1980–81). Also, all new applications for racing permits issued after February 1, 1971 may only be issued if the Commission, *inter alia*, determines that the issuance of the permit is in the public interest and is *economically feasible*. Ariz.Rev.Stat. § 5–108.01 (West 1974 & Supp. 1980–81). Thus, a free market does not determine who should obtain or continue to hold permits. The State of Arizona has made that determination one provided by statutory law and administrative action.

Turf attempts to separate the various regulatory aspects of the Arizona statutes and the Commission's duties into regulation of gambling, applications for permits, etc. It does this to invoke *Cantor* in support of its position. Arizona, however, has an integrated regulatory scheme. Unlike the situation in *Cantor*, where the regulation of the distribution of electricity could be easily separated from the regulation of the distribution of light bulbs, regulation of gambling requires regulation of permittees, and the manner in which they were selected. We hold, therefore, that the first condition of *California Liquor Dealers* is met.

Turf's argument that the second condition, *viz.*, "active supervision," is also rejected. The Commission does not merely acquiesce in the agreement regarding the al-

location of dates. It remains under a duty to "thoroughly investigate" a permit application. To obtain a permit an applicant must meet *all* the relevant criteria. The Commission, unlike the situation in *California Liquor Dealers*, in effect does review the "reasonableness" of the private date allocation agreement.[10]

Consequently, the *Parker v. Brown* doctrine shields the date allocation agreement from the Sherman Act.

AFFIRMED.

POOLE, Circuit Judge, concurring specially:

I concur in parts I, II, III, and V of the majority opinion, but not in part IV.

Whether the allocation of racing dates under the somewhat unique facts here constitutes a potential *per se* violation of the Sherman Act because it amounts to a horizontal restraint between competitors on the same level—an impermissible division of territories—was not decided by the district court. Such a determination was apparently seen by the district judge as a complex and troublesome antitrust issue, the resolution of which became unnecessary because he found (although he did not articulate) an alternate and sufficient basis for dismissal of the action under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The majority here also finds that there is the same alternate ground upon which to rest its affirmance and I have concurred in that determination.

I would, however, postpone to another day the responsibility for deciding an issue whose disposition is not nearly as easy or as clear as the majority assumes and which we simply do not need to tackle at this time.

Were the holding on this point really to be taken as a live precedent, I would find it necessary to express dissent. Since, however, that discussion seems mainly to be an interesting analysis rather than overtly decisional, I prefer to limit my concurrence to

10. The portion of section 5–110(A) dealing with the alternating date applications has been construed to be "directory" rather than "mandato-

ry." *Arizona Downs v. Arizona Horsemen's Foundation, supra*, at 555, 637 P.2d at 1058.

the majority's opinion (which I find otherwise quite satisfactory) in the manner I have set forth above.