Ervin C. PALMER and Gloria M. Palmer, husband and wife, and Tim Palmer, Plaintiffs-Appellants,

v.

ROOSEVELT LAKE LOG OWNERS ASSOCIATION, INC., et al., Defendants-Appellees.

No. 79–4307.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 1981.

Decided July 27, 1981.

David L. Broom, Hamblen, Gilbert & Brooke, P. C., Spokane, Wash., for plaintiffs-appellants.

Ramer B. Holtan, Jr., Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., for defendants-appellees.

Before WRIGHT, FARRIS and NORRIS, Circuit Judges.

NORRIS, Circuit Judge:

This appeal raises the question whether an alleged restraint placed on log salvaging on Roosevelt Lake[1] in the state of Washington has a sufficient connection to interstate commerce to satisfy the jurisdictional requirements of the Sherman Act.

### I.

The plaintiffs-appellants, Ervin and Gloria Palmer and their son, Tim, brought this private antitrust suit against defendants-appellees, the Roosevelt Lake Log Owners Association, various member companies of the Association, and a navigation company engaged by the Association to retrieve stray logs on Roosevelt Lake. The plaintiffs ran a small family business consisting of retrieving stray logs that were allegedly lost and abandoned on Roosevelt Lake while being transported by the timber companies to local lumber mills. The Roosevelt Lake Log Owners Association is an association of timber companies with logging interests on Roosevelt Lake.

The plaintiffs' complaint asserts that the defendants sought to restrain trade in the "gathering, transporting, storing and sale" of abandoned logs on Roosevelt Lake in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and corresponding Washington statutes, Wash.Rev. Code §§ 19.86.-030; 19.86.040. The alleged unlawful conduct included having "threatened, warned and advised" the Palmers not to gather or sell abandoned logs on the lake and having "warned, requested and advised" lumber mills not to purchase logs from the Palmers.

The defendants moved to dismiss the complaint on the ground there was an insufficient nexus to interstate commerce to support Sherman Act jurisdiction.[2] In support of jurisdiction, Ervin Palmer testified on deposition that in 1976 the appellants retrieved approximately 100,000 board feet of abandoned logs which were sold for $7,000 to the Harvey Creek Lumber Company, a local Washington lumber mill. The owner of the Harvey Creek Lumber Company testified by affidavit that the logs purchased from the Palmers were cut into railroad ties and sold to Burlington Northern and Union Pacific Railroads. He also testified that the ties sold to Burlington Northern were to be used near Paradise, Montana, and that it was his understanding that the ties sold to Union Pacific were, in part, used outside the state of Washington. Other affidavits submitted by appellants indicate that between 50% and 90% of all Washington timber is used outside of the state. In addition, Ervin Palmer estimated that millions of board feet of logs have been abandoned on Roosevelt Lake and are available to be salvaged. He also testified that the Palmers could have retrieved approximately 500,000 board feet per year from Roosevelt Lake, had it not been for defendants' unlawful conduct.

Defendants' memorandum in support of the motion to dismiss argued that the plaintiffs' evidence was insufficient to establish that the lumber or lumber products manufactured from the logs gathered by the Palmers were, in fact, ever placed in interstate commerce. Defendants also argued that salvageable logs on Roosevelt Lake comprise such a small proportion of all logs harvested in the state of Washington that any restraint involving such logs, or involving the lumber manufactured from such logs, could not have a substantial effect on interstate commerce.

---

1. Roosevelt Lake is a large artificial lake in central Washington created by the damming of the Columbia River at Grand Coulee in the 1930's.

2. Defendants' correlative claim that there was no independent jurisdictional basis for the state claim apparently was not controverted by plaintiffs.

The district court granted defendants' motion to dismiss[3] and the Palmers appeal. We note jurisdiction under 28 U.S.C. § 1291.

## II.

Jurisdiction under the Sherman Act extends not only to activities actually in interstate commerce, but also to activities wholly local in nature that substantially *affect* interstate commerce. *McLain v. Real Estate Bd.*, 444 U.S. 232, 237, 241, 100 S.Ct. 502, 506–07, 508, 62 L.Ed.2d 441 (1980). "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *United States v. Women's Sportswear Mfrs. Ass'n*, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949). The plaintiffs contend that the logs they retrieved were in the stream of interstate commerce and also argue that the defendants' unlawful activities substantially affected interstate commerce. Because we conclude that the defendants' activities substantially *affected* interstate commerce, we need not reach the question whether those activities were *in* interstate commerce.

In determining whether the activities in this case substantially affected interstate commerce, we are guided by the Supreme Court's recent decision in *McLain v. Real Estate Bd.*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). In *McLain*, real estate purchasers and sellers sued real estate brokers in the New Orleans area, alleging that the brokers had conspired to fix the price of their brokerage commissions in violation of section 1 of the Sherman Act. The Supreme Court held that the plaintiffs had established a sufficient connection to interstate commerce to withstand defendants' motion to dismiss for lack of jurisdiction. Chief Justice Burger, writing for a unanimous court, noted that to establish jurisdiction it would be sufficient to show that the defendants' brokerage activities, *i. e.*, that part of the "[defendants'] activities infected by the price-fixing conspiracy," had a substantial effect on interstate commerce. *Id.* at 242, 246, 100 S.Ct. at 509, 511. It was not necessary to establish that the defendants' particular unlawful conduct substantially affected commerce, for otherwise "jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect." *Id.* at 243, 100 S.Ct. at 510.

The Court then set forth a two-part analysis for determining if the commerce requirement was satisfied. First, a relevant aspect of interstate commerce must be identified. Second, the defendants' activities must be shown " 'as a matter of practical economics' to have a not insubstantial effect on the interstate commerce involved." *Id.* at 246, 100 S.Ct. at 511 (citation omitted). The *McLain* court identified the relevant aspect of interstate commerce as the financing of residential property in New Orleans and the insuring of titles to such property. It reasoned that "[u]ltimately, whatever stimulates or retards the volume of residential sales, or has an impact on the purchase price, affects the demand for financing and title insurance, those two commercial activities that on this record are shown to have occurred in interstate commerce." It then concluded that defendants' brokerage activities affected the frequency and terms of residential sales transactions in New Orleans, and thus had a not insubstantial effect on the demand for financing and title insurance. *Id.* at 245–47, 100 S.Ct. at 510–511.

Applying this analysis to the facts of this case, we identify the relevant aspect of interstate commerce as the sale of Wash-

---

**3.** The defendants' motion asked for "summary judgment in their favor dismissing this action for lack of subject matter jurisdiction." The district court construed this motion as a 12(b)(1) motion. However, whether we construe this motion as a Rule 12(b)(1) motion or a motion for summary judgment, for the purposes of determining Sherman Act jurisdiction, we read the pleadings and the proffered evidence in the light most favorable to the plaintiffs. *See McLain v. Real Estate Bd.*, 444 U.S. 237, 245–47, 100 S.Ct. 506–507, 510–11 (1980); *Western Waste Service Systems v. Universal Waste Control*, 616 F.2d 1094, 1095 n.1 (9th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980).

ington lumber and lumber products for use outside the state. The record shows that approximately 10% of the nation's softwood lumber is produced in the Inland Empire, an area comprising eastern Washington, Northern Idaho, and Western Montana, leaving no question that an appreciable amount of commerce is involved in the out-of-state sale of Washington lumber and lumber products. The only remaining question is whether the activities allegedly infected by the unlawful restraint—in this case, the retrieval of salvaged logs on Roosevelt Lake and their sale to lumber mills—have, as a matter of practical economics, a not unsubstantial effect on interstate commerce in Washington lumber and lumber products.

The record indicates that few whole logs harvested in Washington are exported directly out-of-state. Rather, the logs are most frequently sold to local lumber mills, where they are cut and processed before being sold for use outside the state. The alleged restraint in this case operates directly on the supply of logs available for sale to these lumber mills. As such, it "unreasonably burdens the free and uninterrupted flow" of Washington lumber and lumber products out-of-state. *See Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976).[4]

The plaintiffs' complaint alleges that the defendants conspired to monopolize trade in the retrieval and sale of abandoned logs on Roosevelt Lake. The result of such a monopoly would be to reduce the number of suppliers of logs, salvaged or otherwise, to the mills. Such a restriction on the number of suppliers could, as a matter of practical

economics, ultimately be expected to affect the price or volume of sales of Washington lumber and lumber products out-of-state. *See Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948), *explained in Rasmussen v. American Dairy Assoc.*, 472 F.2d 517, 525 (9th Cir. 1972), *cert. denied*, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973); *see generally L. Sullivan*, Handbook of the Law of Antitrust, § 233 at 711 (1st ed. 1977).

The Ninth Circuit recently had an opportunity to consider a similar fact situation in *Western Waste Service Systems v. Universal Waste Control*, 616 F.2d 1094 (9th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980). There, the plaintiff brought an action under the Sherman Act against a local Phoenix waste disposal company, claiming that it had attempted to monopolize the waste disposal business in the city of Phoenix. In reversing, the district court's dismissal of the complaint for lack of subject matter jurisdiction, we noted that the defendant delivers several tons of refuse it collects to recyclers, who ship the recycled materials out-of-state. We then concluded that the defendant's sales to the recyclers were the

beginning point for a significant line of interstate commerce. If Universal succeeds in its alleged attempt to drive Western Waste out of business, the number of suppliers from whom the dealers may purchase such scrap materials for out-of-state shipment will diminish. With fewer suppliers in the market, the suppliers of such scrap materials will be able to restrict supply and raise their prices with a concomitant reduction in

---

4. The defendants contend, however, that these putative effects on commerce are wholly speculative in that the plaintiffs have failed to show that salvaged logs are in fact cut, processed and sold interstate. Even putting aside the affidavit by the owner of the Harvey Creek Lumber Mill that the salvaged logs sold to him by the plaintiff were sold as railroad ties and that it was his understanding that they were used, in part, outside the state of Washington,

the record indicates that anywhere from 50% to 90% of all timber from Washington is sold for use outside of the state. Absent proof that salvaged logs are by their very nature, unfit for sale outside the state of Washington, we consider the proffered evidence sufficient to demonstrate that salvaged logs have been, and will continue to be transformed into lumber products and sold for use in out-of-state markets.

the interstate commerce of such materials.

*Id.* at 1098.[5]

■ The defendants contend, however, that the effects on interstate commerce cited by the plaintiffs are too insignificant to serve as bases for Sherman Act jurisdiction. We disagree. Jurisdiction under the Sherman Act does not fail simply because the plaintiff has failed to quantify the adverse impact of the defendant's conduct. *McLain*, 444 U.S. at 243, 100 S.Ct. at 510. Nor will jurisdiction be defeated because the impact on commerce falls short of affecting the market price of goods traveling in interstate commerce. *See Hospital Bldg. Co v. Trustees of Rex Hospital*, 425 U.S. at 745–46, 96 S.Ct. at 1853.[6] *See also L. Sullivan*, Handbook of the Law of Antitrust, § 233 at 710 (1st ed. 1977) ("[I]t is not the quantitative substantiality of the impact on the flow of commerce that is critical . . .; if a local activity has in a practical sense a significant impact on competition in commerce and if the commerce so affected is substantial in amount, the Act applies to the local activity even though the activity does not reduce the quantity of interstate commerce in any discernible degree, or perhaps even if it does not alter it at all, or, indeed increases it."), *quoted in Chatham Condominiums Ass'n v. Century Village, Inc.*, 597 F.2d 1002, 1008 (5th Cir. 1979).

Thus, for example, in *Klor's Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959), the Court held that allegations of a group boycott of a single retailer by manufacturers and distributors of household appliances was sufficient to state a claim for relief under the Sherman Act despite the absence of proof that defendants' activities affected the price, quantity or quality of goods offered to the public. The Court noted that the restraint

> interferes with the natural flow of interstate commerce. It clearly has, by its "nature" and "character," a "monopolistic tendency." As such it is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups.

Id. at 213, 79 S.Ct. at 710.

Similarly, in *Gough v. Rossmoor*, 487 F.2d 373 (9th Cir. 1973), this court held that a scheme to prevent a single retail carpeting store from selling carpets to a local residential housing project possessed a sufficient connection to interstate commerce to support Sherman Act jurisdiction. The court reasoned that since the plaintiff bought his carpets from out-of-state manufacturers the defendants' conduct had "[interfered] with the natural flow of interstate commerce." *Id.* at 378, *quoting Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959). The court then concluded that "the relationship between the elimination of competition in these retail sales of carpeting at Rossmoor Leisure World [the housing project] and the national interest in the distribution of carpeting in a free competitive economy is not so tenuous as to bar federal intervention, though the market monopolized in this in-

---

**5.** The court also relied, as a basis for its decision, on the fact that the plaintiff had purchased garbage compaction equipment from an out-of-state supplier and the defendant had financed almost all its equipment purchases with out-of-state financing. *Western Waste*, 616 F.2d at 1098–99.

**6.** In *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), the Court held that allegations that a small hospital providing local hospital services had been prevented from expanding its facilities were sufficient to establish the requisite interstate nexus where the hospital bought many of its medical supplies from out-of-state companies and the financing of the hospital expansion would come from out-of-state sources. In reaching that result, the Court stated that an effect on interstate commerce can be substantial under the Sherman Act even if its impact "falls far short of causing enterprises to fold or affecting market price." *Id.* at 745, 96 S.Ct. at 1853. It is sufficient for the plaintiff to demonstrate that the alleged restraint "will place 'unreasonable burdens on the free and uninterrupted flow' of interstate commerce." *Id.* at 746, 96 S.Ct. at 1853.

stance was small." 487 F.2d at 378. *See also Feminist Women's Health Center, Inc. v. Mohammad*, 586 F.2d 530, 539–41 (5th Cir. 1978), *cert. denied*, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979) (substantial impact on commerce where an abortion clinic purchased $4,000 or $5,000 worth of out-of-state supplies a year and received $12,000 worth of yearly business from out-of-state patients); *Optivision, Inc. v. Syracuse Shopping Ctr. Assocs.*, 472 F.Supp. 665, 672–74 (N.D.N.Y.1979) (less than $80,000 in purchases from out-of-state suppliers, in combination with a small number of sales to out-of-state customers, is sufficient to show that interstate commerce has been substantially affected). *Cf. Tiger Trash v. Browning-Ferris Industries*, 560 F.2d 818, 825 (7th Cir. 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978) (revenues of $30,000 generated in interstate product market certainly constitute more than a *de minimis* amount of interstate commerce under the "in commerce" test).

█ In his deposition testimony, Mr. Palmer estimated that the family business was capable of recovering, without further expansion, approximately 500,000 board feet of logs per year, worth about $35,000 in 1976. In addition, he estimated that there are millions of board feet of salvageable logs in Roosevelt Lake. We cannot conclude from these facts, taken as true, that the retrieval and sale of abandoned logs on Roosevelt Lake has a wholly insubstantial effect on interstate commerce in lumber and lumber products.

As the Supreme Court in *McLain* noted,

It is axiomatic that a complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [cites omitted]. This rule applies with no less force to a Sherman Act claim, where one of the requisites of a cause of action is the existence of a demonstrable nexus between the defendants' activity and interstate commerce.

444 U.S. at 246, 100 S.Ct. at 511.

The judgment is REVERSED and the case REMANDED.