**PALMER, et al., Plaintiffs,**

v.

**ROOSEVELT LAKE LOG OWNERS ASSOCIATION, et al., Defendants.**

No. C–77–158.

United States District Court, E.D. Washington.

Nov. 23, 1982.

---

David L. Broom, Spokane, Wash., for plaintiffs.

Paul F. Allison, Terence R. Whitten, George Tichy, Spokane, Wash., Ramer B. Holtan, Jr., Seattle, Wash., for defendants.

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF DISMISSAL

QUACKENBUSH, District Judge.

### BACKGROUND

Plaintiffs, Ervin and Gloria Palmer and their son, Tim, filed this private anti-trust suit on May 20, 1977, against the Roosevelt Lake Log Owners Association, various member companies of the Association, and a navigation company hired by the Association to retrieve stray merchantable [1] logs on Roosevelt Lake.

Plaintiffs ran a small family business of retrieving merchantable logs allegedly abandoned on Roosevelt Lake while being transported by defendants to local lumber mills. The complaint alleges defendants sought to unlawfully restrain trade in retrieving for sale the abandoned logs.

Defendants moved to dismiss the complaint on the ground there was an insufficient nexus to interstate commerce to support Sherman Act jurisdiction.[2] 15 U.S.C. §§ 1 and 2. On April 16, 1979, the Hon. Marshall A. Neill GRANTED defendants' motion and plaintiffs appealed.

In reversing and remanding, the Ninth Circuit identified the relevant aspect of interstate commerce as the sale of Washington lumber for use outside the state. Taking as true plaintiffs' allegations that Roosevelt Lake contained millions of board feet of salvageable logs, the panel was unable to conclude that retrieval and sale of abandoned logs has an "insubstantial effect" on interstate commerce. *Palmer v. Roosevelt Lake Log Owners Ass'n,* 651 F.2d 1289, 1291–94 (9th Cir.1981).

Defendants then moved for summary judgment of dismissal arguing that while plaintiffs may have suffered disparagement of title and/or other redressable state law injuries, they have nevertheless suffered no *antitrust* injury. Hence, it is contended, this matter should be resolved in the presently stayed state court action rather than in this federal antitrust action. This issue had not been presented to or addressed by Judge Neill or the court reviewing the earlier dismissal, Ct.Rec. 54 and *Palmer v. Roosevelt Lake Log Owners Ass'n,* 651 F.2d 1289 (9th Cir.1981), nor does the circuit's ruling upon the interstate commerce issue preclude the present motion.

### FACTS

(The facts, except for whether defendants have abandoned logs on Roosevelt Lake, are essentially undisputed. As discussed *infra,* resolution of the abandonment question does not present an antitrust issue).

The Roosevelt Lake Log Owners Association, Inc. (ASSOCIATION) is a nonprofit, non-stock corporation, created in 1949 under the laws of the State of Washington. The remaining defendants are members of the

---

1. A merchantable log is one that can be sold and sawed into boards. Deposition of Roy Weatherman, Ct.Rec. 96, Tab 3.2 at 52. Stray logs as used in this memorandum are merchantable logs which have escaped from a raft or boom of the company transporting the logs to lumber mills.

Depending upon the species, a stray log can float in the lake up to 15 years without losing its merchantability. *Id.*

2. Plaintiffs also raise pendent claims under the identical sections of the State anti-trust statutes, R.C.W. §§ 19.86.030 and 19.86.040. In addition, plaintiffs have pending a case in Stevens County Superior Court alleging state common law causes of action. Also, plaintiffs' earlier claims under maritime and salvage law have been terminated.

Association who harvest timber and float logs along the lake to mills on the lakeshore. See Admitted Facts, Pretrial Order, Ct.Rec. 51 at 3. The logs are transported by means of rafts and booms, and it is from these rafts and booms that some logs escape. There is no dispute that Association members owned all escaped logs at one time.[3]

One of the stated purposes of the Association is "to pick up, distribute, regulate and otherwise control stray logs in Roosevelt Lake." Admitted facts, Pretrial Order, Ct. Rec. 51 at 3. In picking up, regulating and otherwise controlling stray logs on the lake, the Association acts as agent for and on behalf of its members and has written authorization from its members to do so. Admitted facts, Pretrial Order Ct.Rec. 51 at 4.

Defendant Columbia Navigation Co., unlike the other defendants, is not in the lumber business. Rather, it is or has been engaged in various business activities including log retrieval on the Lake. Admitted Facts, Pretrial Order, Ct.Rec. 51 at 3.

The Lake is part of the Columbia River upstream from Coulee Dam, and is classified as a navigable body of water. Ct.Rec. 51 at 3. Part of the Lake, its waters and its shores is administered in various respects by the National Park Service, United States Department of the Interior, as a National Recreation Area. Ct.Rec. 51, Affidavit of Ervin C. Palmer, Tab 1.4 at 3.

From 1939 until 1963, Ervin Palmer worked for or handled the logs of all major and most of the gypo loggers in the Northwest and Puget Sound area, including log cribs from Alaska, Canada and Sekiu. Affidavit of Ervin C. Palmer, Ct.Rec. 96, Tab 1.4 at 2. In 1962, Palmer decided to move to the Lake area since he had lived relatively near the area as a child. Id. at p. 4. He became convinced that the main methods used on the Lake for transporting logs were inefficient and permitted many more logs to escape than should have. Id.

Palmer was able to state from his experience that nowhere in the Puget Sound area is the merchantable log drift permitted that is tolerated in the Roosevelt Lake area. Indeed, in Western Washington, by state law,[4] logs must be branded so that owners may be identified. By state law, branding is not required at Lake Roosevelt.[5] Palm-

---

**3.** Earlier there was a contention by plaintiffs that a portion of the escaped logs in the Lake floated south from Canada and therefore did not belong at any time to Association members. Ct.Rec. 96, Affidavit of Hal Marchant, Tab 2.1 at 2. However, this is no longer disputed since it is conceded that the "China Bar" collecting boom which is stretched across the point where the Canadian logs float into the Lake catches those stray logs. Thus, defendants, as well as anyone else, may pay the Department of Reclamation for logs collected at that boom.

**4.** RCW § 76.36.020: Forest, products and equipment to be marked. Every person who shall put into any of the waters of this state, or ship on any common carrier railroad for the purpose of floating or rafting in any of said waters, any forest products, or use any booming equipment as a part of his operation in securing, rafting or floating forest products, shall have a mark or brand, previously selected by him and registered in the manner hereinafter provided, plainly impressed or cut in a conspicuous place on each stick or piece of forest products so shipped on any common carrier railroad or put into any of said waters and on each piece of booming equipment so used.

**5.** RCW § 76.36.140: Application of chapter to eastern Washington. In view of the different conditions existing in the logging industry of this state between the parts of the state lying respectively east and west of the crest of the Cascade mountains, forest products may be put into the water of this state or shipped on common carrier railroads without having thereon a registered mark or brand, as herein required, *within that portion of the state lying east of the* crest of the Cascade mountains and composed of the following counties to wit: Adams, Asotin, Benton, Chelan, Columbia, Douglas, Ferry, Franklin, Garfield, Grant, Kittitas, Klickitat, Lincoln, Okanogan, Pend Oreille, Spokane, Stevens, Walla Walla, Whitman and Yakima; and the penalties herein provided for failure to mark or brand such forest products shall not apply: *Provided,* That any person operating within such east portion of the state may select a mark or brand and cause it to be registered in the office of the supervisor of forestry pursuant to the terms of this chapter, and use it for the purpose of marking or branding forest products and booming equipment, and, in the event of the registration of such mark or brand and the use of it in marking or branding forest products or booming equipment, the provisions hereof shall apply as to the forest products and booming equipment so marked or branded.

er's experience was that lost logs are retrieved immediately in Western Washington.

In June of 1963, Palmer purchased property in the Lake area, and in 1974 he bought a small tug for the purpose of creating a job for himself and performing a service which he believed no one else was performing. He applied for a state license and was informed the Lake was excluded from the state branding laws since the early 1950's. State licensing personnel also informed Palmer that the Association took care of log salvaging.

The Association solicited bids and entered into contracts for salvage of stray logs. The Association contracted with only one firm at a time, and the contracts were of a one year duration. The operator of defendant Columbia Navigation Co., Roy Weatherman, had consistently won these contracts. Ct.Rec. 96, Tab 4 at documents 9 and 10; First Affidavit of Ervin Palmer, Ct.Rec. 96, Tab 1.4 at 5–7. When Palmer stated his interest in bidding on tow boat work for the Association, he was invited to bid for the job. Palmer was told by George Tichy, the Association's attorney, that Palmer should attend a meeting on April 30, 1976. However, Palmer could not attend because just before the meeting, he became seriously ill with appendicitis and was laid up for six weeks.

When Palmer had recovered, he informed Tichy he was ready to salvage the stray logs. Tichy said Weatherman had been awarded the contract for that year and that Palmer could be considered the next year. Palmer told Tichy that there were still logs adrift, that he could not wait until next year to feed his family, and that he was going to start a salvage business. *Id.*

Palmer then went to the Park Service where the Land Manager issued a log salvage permit on July 12, 1976. Admitted Facts, Pretrial Order, Ct.Rec. 51 at 3. The permit contained the reservation that it was not intended to resolve any dispute to lawful title of material found on the Lake. Palmer Complaint filed September 16, 1976 in Stevens County Superior Court, attach-

ment to Ct.Rec. 82. The ranger informed Palmer that they were grateful for removal of any logs from the Lake. He was also told by other park personnel that it is not the natural debris that gives them trouble, but the merchantable logs since such logs are harder to burn.

At this point Palmer felt he could further perform a service by saving tax dollars by removing hazards to navigation and recreation by putting back and recycling natural resources otherwise neglected. Affidavit of Ervin C. Palmer, Ct.Rec. 96 at 8. Commencing in June of 1976, Palmer and his son gathered 113,000 board feet of logs from the lake. Admitted Facts, Ct.Rec. 51 at 4.

Palmer contacted Tichy about selling 300 logs. Tichy became upset and told Palmer that all the merchantable lumber afloat and on the beach belonged to one of the members of the Association. Palmer was threatened with arrest for theft. Affidavit of Ervin C. Palmer, Ct.Rec. 96, Tab 1.4. The local Lincoln Mill log buyer refused to purchase Palmer's logs, saying that the mill had a contract with Weatherman and accused Palmer of being a thief. Later Tichy asked Palmer to meet with some of the members as they did not want Palmer arrested. When Palmer arrived he was asked where his attorney was, and Palmer said he did not need one. Tichy proceeded to read to Palmer the laws he said protected the members.

Since the Association did not offer to buy the logs, Palmer traveled to Cedonia, Washington where he found an interested buyer. Palmer delivered approximately 100,000 board feet, but the buyer would not pay for them as he had been contacted by representatives of the members who threatened him with arrest for theft. The mill operator further told Palmer that Weatherman offered to sell 400 logs for $45.00 per 1,000. Palmer's price had been $75.00 per 1,000 which Palmer believed was a bargain. *Id.* at 10 and 11. For the purposes of this motion, plaintiffs' additional contention that the warnings not to deal with Palmer precluded him from engaging in the salvage business is accepted as true.

Again, in 1977 and 1978, prior to letting the contracts for these respective years, the Association by letter offered Palmer the opportunity to bid for the log salvage contracts for those respective years, but plaintiffs did not bid for either year. Palmer believes there are in excess of 1,500,000 board feet of stray merchantable logs in the Lake's waters.

## DISCUSSION

Discovery has been completed in the present action. The parties have briefed and argued the issues presented by defendants' motion for summary judgment of dismissal and submitted supplemental briefs upon the court's request. Additional argument also has been heard. This court has considered the entire file and arguments of counsel and recognizes the importance to plaintiffs of proceeding to trial. However, the court concludes that summary judgment of dismissal (and without prejudice to the stayed state court proceeding) must be GRANTED since antitrust liability may not attach even if all issues of fact were to be resolved in plaintiffs' favor. For the reasons to be discussed, the court can only conclude that this dispute is over property rights to the stray logs on the Lake. While it may be that plaintiffs will be entitled to significant damages on state common law claims, this court is unable to conclude that plaintiffs suffered *antitrust* injury.

Plaintiffs argue, Ct.Rec. 104 at 7, that they have placed into the record *prima facie* evidence of five anti-trust offenses: group boycott and conspiracy to engage in group boycott (Section 1 of the Sherman Act, 15 U.S.C. § 1); and monopoly, attempt to monopolize, and conspiracy to engage in monopoly (Section 2 of the Sherman Act, 15 U.S.C. § 2).

In support of plaintiff's *per se* theory, plaintiffs principally rely upon *Klor's v. Broadway-Hale Stores,* 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959) where the Supreme Court held that "[g]roup boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category [and] . . .

have not been saved by allegations that they were reasonable in the specific circumstances." Thus, *Klor's* instructs that a practice which may be characterized as a "group boycott" is conclusively presumed unlawful. This "per se" rule does not require further analysis under the "rule of reason" which is generally applied in Sherman Act cases. There are three categories of competitive restraints, in addition to the group boycott category, which have been held unreasonable *per se:* (1) Horizontal and vertical price fixing; (2) Horizontal market division; and (3) Tie-in sales. *A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1305 (9th Cir.1981). *Klor's* has been generally criticized for not defining the term "group boycott". *Ron Tonkin Gran Turismo v. Fiat Distributors,* 637 F.2d 1376, 1382 (9th Cir.1981). In the 23 years which have passed since *Klor's,* the Supreme Court has developed a test to be applied for determining whether the conclusively illegal presumption must be applied to the agreement or practice.

In construing whether certain challenged conduct fell within the *per se* category of "price fixing", the Supreme Court recently opined that "[e]asy labels do not always supply ready answers." *Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979). The *Broadcast Music* court specifically rejected taking a "literal approach" in determining whether given conduct falls within a forbidden *per se* category. Rather, the test to be applied is whether the agreement or practice is so " 'plainly anticompetitive' [citations omitted], and so often 'lack[s] . . . any redeeming virtue' ", that the conduct is conclusively presumed to be illegal. Further, "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations." *Id.* at 8 and 9, 99 S.Ct. at 1556 and 1557. Accord, *Arizona v. Maricopa County Medical Society, et al.,* —— U.S. ——, —— n. 19, 102 S.Ct. 2466, 2476 n. 19, 73 L.Ed.2d 48 (1982). As in *Broadcast Music, Inc.,* and as the parties agree, this court is examining a unique set of facts. That is, in dealing with whether

the conduct of dominion over stray merchantable logs in a lake which is primarily under National Park Service jurisdiction and exempt from certain state logging laws is violative of antitrust law, this court recognizes, as do the parties, it is confronted with *sui generis* conditions. *See Broadcast Music, Inc.,* 441 U.S. at 10, 99 S.Ct. at 1557. It is for this reason, that there is no "experience" to "counsel" that the challenged practices here must be found to fit into any of the *per se* categories including the amorphous category of "group boycotts" ("concerted refusals by traders to deal with other traders").

Specifically, the first practice which needs to be addressed is whether the individual logging company defendants may integrate stray log retrieval efforts by assigning their rights, if any, in the stray logs to the defendant Association. The second practice to be addressed is whether the Association may annually grant only one contract for all retrieval work. The last challenged practice concerns the disputed ownership of the stray, merchantable logs. Specifically, where the Association erroneously believes it has retained a legal property right to the stray logs, may it refuse to purchase from plaintiffs what the defendants perceived to be "rustled" logs? Further, may defendants demand that plaintiffs not retrieve such logs absent being awarded an exclusive contract and under threat of swearing out a complaint for Palmer's arrest? Finally, may defendants warn a prospective purchaser of the Association's claim of ownership in the allegedly "rustled" logs, and may defendants' similarly communicate its intent to swear out a complaint for the prospective purchaser's arrest?

The first practice at issues does not appear to fit into any of the traditional *per se* categories. Applying the *Broadcast Music* analysis, this court is unable to conclude that the collective assignment of rights to logs is "plainly anticompetitive" and lacking of "any redeeming virtue". Such a "joint venture" has redeeming virtue since the arrangement should theoretically result in more efficient log retrieval. Nor can this court conclude that this joint venture organized for the purpose of leased log retrieval is *"plainly* anticompetitive". Thus, the *per se* rule is inapplicable to this agreement. Instead, the "joint venture" must be analyzed under the rule of reason, discussed *infra. See Appalachian Coals, Inc. v. United States,* 288 U.S. 344, 58 S.Ct. 471, 77 L.Ed. 825 (1933).

Plaintiffs specifically seek to fit the second practice of exclusive contracting, into the "group boycott" *per se* category. Plaintiffs contend, and for purposes of this motion the court accepts, that defendants' conduct effectively put plaintiff out of business. Since defendants are a large group which refused to deal with plaintiffs, it is argued that a classic "group boycott" situation exists under *Klor's.* Therefore, it is argued that plaintiffs need not show an anticompetitive effect on the relevant logging market, discussed *infra,* and plaintiffs concede that they have no intention of presenting such expert testimony. Ct.Rec. 104 at 17, 1.3, *et seq.*

However, plaintiffs started their business in 1976. It is undisputed that prior to letting the 1976 contract, plaintiffs were invited to bid. Palmer became ill and did not bid. It is undisputed that this six week illness was the proximate cause of his failure to bid, which failure to bid undisputedly resulted in the contract award going to Weatherman during the interim. It is not asserted that anyone else bid or desired to bid for the contract. This court is unable to conclude that the failure to award a contract to one who has not bid under these circumstances is a "plainly anticompetitive" practice which lacks all "redeeming virtue". Accordingly, this conduct must also be tested under the rule of reason, discussed *infra.* As stated by the court in its Order granting a defense motion for summary judgment in *Ackerman-Chillingworth, Etc. v. Pacific El. Con. Assoc'n,* 405 F.Supp. 99, 108 (D.Haw. 1975), *aff'd,* 579 F.2d 484 (9th Cir.1978), *cert. denied,* 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979):

Plaintiffs, for their own reasons, *did not attempt to compete* with Oda. This does not mean that they were foreclosed—to the extent of a *per se* illegal boycott—from dealing with the contractors, even if a representative of the PECA told a plaintiff he would not be "allowed" to sell insurance to any of the contractors.

In this respect, see, also, Professor Areeda's discussion of concerted refusals to deal:

> One recurring example involves rivals who collaborate to some degree in establishing, selecting, or switching a common source of goods or services or a common outlet. It is not surprising that another source or outlet, whether prospective or replaced, may claim that it has been boycotted. Although the cases are not entirely harmonious, the courts have wisely hesitated to hold such arrangements automatically unlawful and have often held them to be reasonable.

> .  .  .  .  .

> [Joint venturers'] choosing suppliers, bargaining over price, and withholding patronage incident to such choosing and bargaining are not unlawful per se. That conclusion holds whether or not the "boycott" label is applied. Thus, there is no point in trying to characterize the arrangement as a boycott or not.

P. Areeda Anti-Trust Analysis § 385 at 527, 529–30 (3rd Ed. 1981).

The third area of challenged conduct concerns defendants' warning off perspective purchasers of the allegedly "rustled" logs, with threat of prosecution for theft. Plaintiffs do not contend that defendants subjectively knew or believed the logs gathered by Palmer no longer belonged to them. Rather, plaintiffs assert defendants' attempt "to preserve property rights" was "groundless in the face of *legal* abandonment of the logs". Ct.Rec. 104 at 14. That is, plaintiffs' assertion is, that as a legal

conclusion, defendants had abandoned their logs, and for defendants to think otherwise was unreasonable. Further, plaintiffs argue that "[p]ure intentions on good faith" on the part of defendant are no defense. Ct.Rec. at 27.

For the reasons previously discussed, this court is unable to conclude that this third category of conduct is sufficient to go to a jury under a *per se* theory.

The court is assisted by this circuit's recent pronouncement in *Forro Precision, Inc. v. Inter. Business Machines,* 673 F.2d 1045, 1058, 1060 (9th Cir.1982)[6] in which the panel affirmed the trial court's determination that the evidence was insufficient to present an issue for the jury on attempted monopolization. In holding that IBM's invocation of police assistance, which resulted in damages from an investigation and a search of plaintiff's plant (but no indictment as to plaintiff), could not serve as the basis for an antitrust claim, the court reasoned:

> The sham exception permits the imposition of antitrust liability on those seeking action from government agencies only when the activity in question can serve no useful purpose, and is undertaken for purely anti-competitive reasons. If, in the case before us, IBM had provided the police with deliberately false information, solely for the purpose of harassing Forro or of achieving other ends unrelated to law enforcement, its conduct would unquestionably come within the sham exception.

> However, even when the evidence is viewed most favorably toward Forro, we cannot say that the evidence would support a finding that IBM's request for help from the San Jose Police Department in catching those who were stealing its trade secrets was a sham. The evidence

---

6. *Forro* is particularly noteworthy in its pronouncement that the *Noerr-Pennington* doctrine includes citizen communications with police officers. *Forro, supra,* 673 F.2d at 1059–60 discussing *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v.*

*Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The "doctrine immunizes from antitrust laws anti-competitive conduct [even if deliberately deceptive] undertaken to influence or petition governmental bodies or to utilize judicial or quasi-judicial mechanisms". *Id.* at 1059.

may support an inference that IBM had the intent to harass the PCM's and the vendors, but Forro had to show as well that IBM had no legitimate purpose in going to the police or that it used the police in an illegitimate manner. The jury's verdict for IBM on its claim of misappropriation of its trade secrets indicates that IBM had cause to seek help from the police, and our review of the record supports that finding. All that can be inferred from the jury's verdict in favor of Forro on its [state] claim of intentional interference is that IBM intentionally interfered with Forro's relationship with its customers. *This would be consistent with a finding of anticompetitive intent, but it sheds no light on whether IBM had a valid purpose in seeking police assistance.*

.  .  .  .  .

*If IBM in good faith asked the police to perform a valid police function, IBM's conduct is immune from antitrust liability notwithstanding the fact that IBM also had anticompetitive intent.* We are unwilling to infer from the jury's rejection of the justification defense that it found IBM's solicitation of police assistance to be a sham.

We conclude that Forro's antitrust claim may not be based on IBM's solicitation of aid from the San Jose Police Department that resulted in the police investigation and search of Forro's premises, or on IBM's assistance in these activities.

Emphasis added. *Id.* See, also, *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 556 & 558 (1st Cir.1974) *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975) (defendants' threats of litigation "reflected only vigorous competition").

It may be that defendants' collective conduct should be characterized as "unfair". However, "allegations of unfair competition . . . are insufficient" when there is "[n]o adverse effect on competition. . . . Such charges might merit scrutiny under state tort law, but without proof of *anticompetitive effect* they are not actionable under

Section 1 of the Sherman Act". Emphasis added. *A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1308 (9th Cir.1981). The minority *Pich-Barth* rule according *per se* treatment to unfair competitive practices designed to eliminate a competitor has been specifically rejected in this circuit. *Id.* at n. 7. As stated in *Cox,* "[t]he intent proscribed by the antitrust laws lies in the purpose to harm competition in the relevant market, not to harm a particular competitor." *Id.* at 1307. Consequently, while arguably innocent behavior is no defense to a *per se* violation under Section 1, the present action does not present circumstances susceptible to a *per se* theory.

■ Having determined that plaintiffs' allegations do not present triable issues of fact under a *per se* theory, and that therefore, plaintiffs must prove their case under the rule of reason, it becomes necessary to determine whether the federal claims may be resolved by way of summary judgment. Under the standard of reason, determination of whether a practice or agreement is prohibited as a restraint of trade depends upon the "purpose" of the arrangement, the character ("power") of the parties, and the necessarily "competitive effect" of their actions. See *Standard Oil of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). More recently, the relevant factors for consideration under Section 1 of the Sherman Act were said to be the particulars unique to the business in question, the conditions before and after the restraint, the nature and effect of the restraint, the "evil" thought to exist, "the reason for adopting the particular remedy", and the "purpose or end" sought. *Arizona v. Maricopa County Medical Society,* —— U.S. ——, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).

■ Typically, in a rule of reason case, since the court must assess impact on competitive conditions, the question of whether a restraint suppresses competition "must await a fully-developed trial record", rather than be resolved through summary proceedings. *Medical Arts Pharmacy v. Blue Cross & Blue Shield,* 518 F.Supp. 1100, 1109

(D.Conn.1981), *aff'd,* 675 F.2d 502 (2d Cir. 1982), citing *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). However, such a searching examination is unwarranted where, as here, plaintiffs have essentially "placed all their eggs in the *per se* basket". *Medical Arts Pharmacy, supra,* at 1109, cited with approval in *Sausalito Pharmacy, Inc. v. Blue Shield of California,* 677 F.2d 47, 48 (9th Cir.1982) (per curiam). See *Cox, supra,* 653 F.2d at 1305, in which the grant of summary judgment in favor of defendant both under *per se* and rule of reason standards was affirmed.

Plaintiffs have not met defendants' summary judgment motion with factual assertions which will permit a factfinder to evaluate the claims under the reasonableness standard. Rather, aside from reliance upon the *per se* theory, discussed above, plaintiffs depend upon a "narrow" product market definition so that "anticompetitive effect" would be proved from plaintiffs' lost business:

> While Palmer *admits that he would be unable to muster the resources to demonstrate the actual quantitative impact of his activities on the overall logging market, he can demonstrate the impact on the market for stray and abandoned logs.* He has demonstrated that stray and abandoned logs were in demand as evidenced by the fact that he was able to sell a load to a sawmill located near the lake where they soon found their way into interstate commerce. *See* Rodenbough Affidavit.

Plaintiffs' Supplemental Memorandum, Ct. Rec. 104 at 17.

While an accurate definition of a product market requires that it be sufficiently "narrow" to exclude all nonsubstitutes, it must nevertheless be broad enough to include all substitutes. If the definition is too narrow, it exaggerates a defendant's ability to impact the market (defendant's market power). Plaintiffs' theory appears to be that stray logs are unique since this product may allegedly be processed at a lower price than non-stray logs. However, plaintiffs have not alleged, and this court concludes the asserted differences, taken as true, do not effect "reasonable interchangeability", as a matter of law. In the so-called *cellophane* case, *United States v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), the government argued that DuPont possessed sufficient market power because the defendant produced most of the cellophane in this country. DuPont defended that cellophane had to compete with other wrapping materials such as aluminum foil and waxpaper. In rejecting the government's theory that the competing products had to be physically similar as well as priced similarly, the Supreme Court spoke to the requirement of "an appraisal of the 'cross-elasticity' of demand in the trade" to determine whether the products are "reasonably interchangeable by consumers for the same purposes", considering price, use and quality. The Court determined that despite cellophane's differences, including desirable appearance and relative inexpensiveness, 351 U.S. at 400–01, 76 S.Ct. at 1009–10, that the relevant product market was much broader.

This court concludes that to narrow the product market from all merchantable logs to stray merchantable logs requires a quantum analytical leap which is unsupportable under the undisputed facts as a matter of law. Indeed, by negative implication, the cellophane case spoke directly to this issue:

> Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another. For example, *one can think of building materials as in commodity competition but one could hardly say that brick competed with steel or wood or cement or stone in the meaning of Sherman Act litigation; the products are too different.* This is the interindustry competition emphasized by some economists.

Emphasis added. 351 U.S. at 393, 76 S.Ct. at 1006; see, also, *Shoe Co., Inc. v. United States,* 370 U.S. 294, 325–28, 82 S.Ct. 1502, 1523–25, 8 L.Ed.2d 510 (1962) (submarkets).

The Supreme Court, then, held that steel should not be compared to wood. The implication is that merchantable *stray* logs (wood) are part of the broader category of merchantable logs (wood), at a minimum,[7] in the Lake's geographical area. Moreover, in the present matter plaintiffs' own expert, in depositions, answered as follows:

Q. Do you draw any distinction in market value between the saw logs, peelers, and railroad tie eligible logs that Mr. Palmer would have salvaged from Roosevelt Lake as distinguished from logs that might be cut in the woods and brought to a mill on a truck or dumped in the lake in bundles and towed and removed again from the lake without having been lost or salvaged or anything: Do you draw a distinction between those two types of logs?

A. No, I don't.

Deposition of Clarence H. Barnes, Ph.D., Ct.Rec. 95 at 32–33.

This conclusion leaves plaintiffs, ab initio, with the burden of demonstrating quantitatively the effect on the logging market, which plaintiff concedes it cannot do. Taking as true plaintiffs' allegations that there are over 1,500,000 board feet of salvageable stray logs and that Palmer can retrieve 500,000 board feet per year, it is nevertheless undisputed that stray logs make up a relatively small percent of the harvested logs in the Lake area. Hence, as a matter of law, plaintiffs cannot show anticompetitive effect, and are therefore unable to take their case to the jury under Section 1 of the Sherman Act.

At this juncture, it is appropriate to note the circuit's prior determination in this case that retrieval of salvageable logs from the Lake affected a "not insubstantial" amount of commerce, *Palmer v. Roosevelt Lake Log Owners Assoc., Inc.,* 651 F.2d 1289, 1294 (9th Cir.1981), has "no reference to the scope of any particular market or to the share of that market foreclosed by" allegedly unreasonable *per se* or otherwise unrea-

sonable conduct. *Fortner Enterprises v. United States Steel,* 394 U.S. 495, 501, 89 S.Ct. 1252, 1257, 22 L.Ed.2d 495 (1969) (Fortner I).

Having determined that stray Lake logs are part of a much broader product market and that Section 1 requirements of the Sherman Act are not implicated under a *per se* or rule of reason analysis, what are the implications under Section 2 of the Sherman Act? To prove a monopolization claim, plaintiffs must establish that defendants possess monopoly power in the relevant market, wilful acquisition or maintenance of that power, and causal "antitrust" injury. *Forro Precision, Inc. v. International Business Machines,* 673 F.2d 1045, 1058 (9th Cir.1982). To establish an attempt to monopolize, the evidence, "at a minimum", must demonstrate a specific intent to control prices or exclude competition *and* predatory conduct directed to the accomplishing of that unlawful purpose. *A.H. Cox v. Star Machinery Co.,* 653 F.2d 1302, 1308 (9th Cir.1981). A third element in "attempt" claims, "though not indispensable, is a dangerous probability of success in monopolization". *Id.* Although related, this third element is *not* the equivalent of market power. *William Inglis, Etc. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1029 (9th Cir.1981) (as amended upon rehearing, Mar. 9, 1982). Rather, "proof of market power can be relevant in drawing the inference of specific intent where the conduct at issue is potentially anticompetitive or ambiguous. If the conduct *clearly* threatens competition, however, the inference will be drawn irrespective of the defendant's market power". *A.H. Cox, supra,* 653 F.2d at 1308. As discussed earlier, under *Forro,* 673 F.2d at 1058 and *Paddock Pool,* 508 F.2d at 556 and 558, defendants' conduct was not "clearly" anticompetitive. As stated previously, as a matter of law, the salvageable logs, interchangeable with all other Lake area logs, make up only a small portion of the product market. Consequently, as a matter of law,

---

7. For purposes of this motion the court will assume plaintiffs have properly limited the geo-graphic market to the Lake area.

the market power of those selling the salvaged logs, is not excessive. Therefore, under the undisputed facts, this court is unable to conclude that any rational factfinder could infer a specific intent to monopolize in the product market.

To summarize, this court has treated all disputed facts as resolved in favor of plaintiffs. The court, having examined plaintiffs' factual allegations to ascertain whether the assertions rise to arguably *per se* and/or predatory conduct, is unable to conclude that inherently triable issues exist. Nor may the federal claims go to the factfinder under the rule of reason for plaintiffs cannot make a *prima facie* demonstration of anticompetitive effect, of market power, or of "ambiguous" conduct. It may be that the defendant contractor who won the bid offered by defendants for log retrieval has acted in a neglectful manner. It may be that the logging practices on the Lake are inefficient, and that defendants have, as a legal matter, "abandoned" their property rights in the escaped logs. However, these claims must be tested under state law, and plaintiffs have not suggested an independent basis from the Sherman Act for keeping their state claims in federal court.

Accordingly, defendants' motion for summary judgment is GRANTED. The federal claims are DISMISSED but WITHOUT PREJUDICE to the pursuance of plaintiffs' state claims in the stayed state court proceedings. IT IS SO

ORDERED. The Clerk is directed to enter this Order and forward copies to counsel.